IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

GARY W. MUFFLEY and
NATIONAL LABOR RELATIONS BOARD,

          Plaintiffs,

v.                                      CIVIL ACTION NO. 5:11-cv-00082

DYNAMIC ENERGY, INC. and
M & P SERVICES, INC.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on Petitioner's Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act, as Amended [Docket 1], filed February 4, 2011. The Court held a hearing on the Petition on June 7, 2011, after reviewing the administrative record submitted by Petitioner.

I. Background

Respondents M & P Services, Inc. ("M & P"), and Dynamic Energy, Inc. ("Dynamic"), are subsidiary companies of the parent corporation Mechel-Blueston Corporation. (Pet. 4.) Both M & P and Dynamic employ laborers at the Coal Mountain, West Virginia, mine site. These employees are supervised by Dynamic employee Mine Manager William "Billy Bob" Marcum. The employees of Dynamic are represented by the union and covered under the National Bituminous Coal Workers

Agreement, but the employees of M & P were not represented by the union during the relevant time period.

In February 2010, the union began an organizing campaign among the employees of M & P, which campaign resulted in signed authorization cards from eight employees between February 14, 2010, and March 9, 2010. (Pet. 4.) On March 11, 2010, one of M & P's employees, Steven Paynter, disclosed to Field Engineer Tracey Steele that the union was going to demand recognition from M & P that day. (Pet. 4.) According to Petitioner, Steele attempted to confirm this information with other M & P employees. (Pet. 5.) On the evening of March 11, 2010, Tom Lusk, the acting president of the Mechel-Bluestone entities, conducted a meeting with Billy Bob Marcum and the Director of Safety and Health Services, Pat Graham, at a restaurant in Gilbert, West Virginia, during which meeting Lusk testified that he was informed by Marcum that several of the M & P employees had signed union cards. (Docket 22-6 at 35.) On the morning of March 12, 2010, in the presence of Steele and Safety Coordinator, Eddie Miller, Billy Bob Marcum informed a group of M & P employees that they were being laid off immediately due to cut backs. (Pet. 5.) Six of these employees, Jeremy Blankenship, Nathan Brown, Christopher Champagne, Phillip Coleman, Steven Paynter and Herrick S. Sheppard, had signed authorization cards.

On April 2, 2010, the union filed a charge with the National Labor Relations Board ("NLRB") alleging that the termination of the six employees violated the National Labor Relations Act ("NLRA"). The union proceeded to hold the election on April 23, 2010, and the ballots cast were impounded as a result of the then pending unfair labor practice charge. On January 12, 2011, Petitioner, counsel for the NLRB, issued a complaint against Respondents alleging violations of Section 8(a)(1) and (3) of the National Labor Relations Act. The parties participated in a hearing

before an Administrative Law Judge on February 22 through 25, 2011, and on March 9 and 10, 2011. The Court has not yet been informed of a decision. Petitioner seeks injunctive relief under Section 10(j) of the National Labor Relations Act pending the final disposition of the complaint.

## II. Briefing

In its Petition, Petitioner requests that the Court issue an affirmative order directing Respondents, pending final disposition of the matters involved herein pending before the NLRB, to:

(a) Offer, on an interim basis, discharged employees Jeremy Blankenship, Nathan Brown, Christopher Champagne, Phillip Coleman, Steven Paynter and Herrick S. Sheppard reinstatement to their former positions, or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges enjoyed, and displacing, if necessary, any employee who has been hired or reassigned to replace them;

(b) On an interim basis, recognize, and upon request, bargain in good faith with the union as the exclusive bargaining representative of the unit concerning terms and conditions of employment and, if an understanding is reached, embody the understanding in an interim signed agreement;

(c) Post copies of the Court's opinion and order at Respondents' Coal Mountain, West Virginia, mine site in all locations where notices to employees are customarily posted, maintain these postings during the NLRB's administrative process free from all obstructions and defacements, and grant to agents of the NLRB reasonable access to these facilities in order to monitor compliance with the posting requirement;

(d) Return subcontracted or reassigned work to bargaining unit;

(e) Read the Court's order to assembled employees, or, at Respondents' option, have a Board Agent read the District Court's order in the presence of a responsible management official; and

(f) Within twenty (20) days of the issuance of the Court's opinion and order, file with the Court, and serve a copy to Petitioner, a sworn affidavit from a responsible official of the Respondent, setting forth with specificity the manner in which Respondent has complied with the Court's order including where exactly Respondent has posted the documents required by the order.

In the memorandum supporting its Petition, Petitioner asserts that the evidence of union activity combined with employer knowledge of such activity satisfies a threshold showing of a likelihood of success on the merits. (Mem. 9.) It states that Respondents cannot show that they would have terminated the six employees in the absence of their union activity. (Mem. 9.) Petitioner further asserts that the balance of equities requires that interim injunctive relief be granted because the termination of the six employees has an irreversible chilling effect on union activity. (Mem. 10-11.)

Respondents responded to the Petition on March 24, 2011 [Docket 13]. They counter that the reasons for terminating the employment of those six individuals were economic in nature, and that the "anticipation of such layoffs by the M & P employees is likely the chief reason why those employees sought job protection by the Union to begin with and the Union sought to organize them." (Resp. 5.) Respondents also point to the fact that the group of employees terminated included individuals who had not signed authorization cards. Respondents further assert there is no evidence of irreparable harm because "most if not all" of the alleged discriminatees obtained employment at other Mechel-Blueston entities and are now earning wages and benefits in union jobs in excess of what they were earning with M & P, and they would be unlikely to accept offers of

reinstatement. (Resp. 6-7.) Respondents also assert that Petitioner's delay of over a year in bringing this dispute to court weighs against the necessity of injunctive relief. Petitioner replied on March 29, 2011, that the terminated employees who subsequently obtained employment at other Mechel-Bluestone entities are now employed at sites farther from their homes. (Rep. 6.) Petitioner further contends that Respondents' actions in terminating the employees were motivated by the threat of unionization, and their termination did not actually save any costs because the work of those employees continued to be performed. (Rep. 5-6.) Finally, Petitioner asserts that the group of employees who were terminated, other than the six discriminatees, consists of security guards "nearly all of whom were almost immediately re-employed at Coal Mountain at the same wage rate, but as employees of a putative security contractor operating out of Beckley, West Virginia." (Pet. 6.)

III. Applicable Law

Section 10(j) of the NLRA confers jurisdiction upon the court to hear this petition and grant relief. It authorizes the NLRB to file a petition with the court alleging unfair labor practices and requesting temporary relief.[1] 29 U.S.C.A. § 160(j). The court may grant injunctive relief under Section 10(j) when it is "just and proper." In *Muffley v. Spartan Mining Company*, 570 F.3d 534

---

[1]Section 10( j ) of the NLRA, 29 U.S.C. § 160( j), provides, "The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

(4th Cir. 2009), our Court of Appeals rejected the "two-step" approach to 10(j) petitions of first determining whether reasonable cause exists to believe a violation of the NLRA has occurred, and then determining if injunctive relief is "just and proper," in favor of the traditional four-part equitable test. *Muffley*, 570 F.3d at 542 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)). The established four-part standard applies to any preliminary injunction request made pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. It requires the court to consider (1) the possibility of irreparable injury to the moving party if relief is not granted; (2) the balance of equities; (3) the likelihood of the moving party's success on the merits; and (4) the public interest. *Id.*; *Blackwelder Furniture Co. v. Seilig Mfg Co.*, 550 F.2d 189, 195-96 (4th Cir. 1977) (overruled in part by *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)).

A.   Likelihood of Success

In determining whether Petitioner is likely to succeed on the merits, the Court looks to the strength of its evidence of unfair labor practices and Respondents' defenses. *See Muffley*, 570 F.3d at 543 (citing *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir. 1989) ("the district judge must consider the strength of the Director's case")). At the hearing, the Respondents contended that there were economic justifications for the firings of the six employees. Specifically, the Respondents asserted that they had received written directives from their Russian owners to cut back on the payroll. The "directive" to which they refer appears to be Respondents' Exhibit 4 included in the administrative record submitted to the Court. This document reflects the agenda of and decisions made during a March 15, 2010, meeting of the Mechel-Blueston "Balance Committee." Decision 11 of this document states,

6

> With the purpose of reducing mine overheads, All Mine Managers to make immediate and drastic reductions to all non direct production related expenses. All support services should be suspended unless directly involved in mining and loading activities. All support activities must be placed on a "Bid Basis" and the descriptions of services needed to Rob Young, Purchasing Director. Any ongoing activities are to be stopped and the work put on a bid basis.
>
> Person in charge      Tom Lusk [CEO of Mechel Bluestone]
> Dateline               March 16, 2010

(Docket 22-11 at 6). Respondents' Exhibit 5 is an email from Tom Lusk to a group of individuals, presumably mine managers and other Mechel-Bluestone supervisors, dated March 11, 2010, stating,

> It is imperative that all efforts be applied to reduce mine overhead. In that effort, I am directing all Mine Managers to make immediate and drastic reductions to all non direct production activities. All support activities must be placed on a "Bid Basis" and the low cost provider awarded the bids for these services. Direct all bids and descriptions of services needed to Rob Young, Purchasing Director. Any ongoing activities are to be stopped and the work put on a bid basis. No Exceptions.

(Docket 22-11 at 7). The heading of the email reflects that it was sent at 9:49 P.M.

It is unclear how the March 15, 2010, meeting summary amounts to a directive for an action that occurred three days prior. Indeed, the March 15, 2010, document, on its face, tends to retroactively justify the directive described in the March 11, 2010, email. Mr. Lusk testified during the administrative hearing that he had been given the instructions to reduce the number of employees prior to March 15th. He also testified that if his superiors wanted something to be done, they would convey it to him in a written directive. (Docket 22-6 at 57-58.) However, the record does not appear to contain a written directive relating to, and dated prior to, the M & P terminations. (Docket 22-6 at 24.) Lusk also testified that he called a dinner meeting at the Gilbert, West Virginia, restaurant the evening of March 11, 2010, to discuss with Billy Bob Marcum and Pat Graham "what our next steps were going to be." (Docket 22-6 at 33.) Lusk admitted that at that meeting the prospect of laying off the specific M & P employees who were, indeed, fired was first discussed.

(Docket 22-6 at 34.) That is also when Lusk claims to have learned that those employees had signed union authorization cards. (Docket 22-6 at 35.)

The evidence suggests that there was a statement made by an M & P employee to a manager on March 11, 2010, revealing union activity among eight M & P employees. That evening, the acting president of M & P called a meeting to discuss reducing overhead, wherein this union activity was discussed and it was decided that a group of M & P employees, including six of the eight who had signed union authorization cards, would be terminated the following morning. On March 12, 2010, these employees were laid off. On March 15, 2010, the decision to lay off these employees was ostensibly officially approved by Mechel-Blueston directors at the Balance Committee meeting. Despite Respondents' representations, the evidence of a separate economic justification for the termination of these employees is lacking, or at best outweighed by the suspicious timing of the termination. For these reasons, Petitioner has demonstrated a likelihood of success on the merits.

B.   Irreparable Harm

At the hearing, Petitioner made assertions of irreparable harm to the union if relief was not granted prior to the culmination of the administrative process. He stated that if the end result of the administrative hearing is reinstatement of the discriminatees' jobs, a long lapse in time between termination and reinstatement makes the prospect of the discriminatees actually opting to return to their jobs less likely. He argued that this delay in relief would cause the union to lose support of those discriminatees as well as future leaders who view union activity as risky based on the long process for relief, thereby diminishing the union's viability and meaning. Petitioner further asserted that irreparable harm would be done to the individual discriminatees. He asserted irreparable harm

to the discriminatees' quality of life because many of them now had to drive further from their homes to their new jobs. He stated that this resulted in economic costs as well as cost to personal and family time. He countered Respondents' contention that the discriminatees were earning more money at their new jobs, by stating that they should have the chance to come back to their old jobs and bargain for higher wages. He finally asserted that the two employees who signed union authorization cards and did not get terminated from M & P are harmed without the benefit of union representation.

The Court disagrees with Respondents' statement during the hearing that a decrease in quality of life cannot be considered irreparable harm. The administrative hearing transcript reveals that at least four of the six discriminatees now drive between twenty-five and seventy-five minutes longer to their new jobs. (Docket 22-2 at 190-191; 22-2 at 158; 22-3 at 20.) This time impinges on the amount of time these men have for their family and social lives. It is unclear from the record whether the increased wages at their new jobs compensate for the increase in transportation related costs. The Court also agrees with Petitioner that irreparable harm is suffered by the union. While delay is built into the administrative system, the longer the discriminatees go without relief the more adverse effects there are with respect to employees willing to seek union membership and protections. The chilling effect on protected activity resulting from allowing a company to engage in unfair labor practices without consequence is damaging and irreparable. As Respondents contend, four out of six of the discriminatees now enjoy the benefits of the union and higher wages in their new jobs. However, by definition, monetary damages do not compensate for irreparable harm. If the discriminatees were earning less now than at their previous positions with M & P, that is a harm that would be fully compensable if relief were to be granted.

C. Balance of Equities

The Court finds that the balance of equities tips in favor of Petitioner. During the hearing, the Court asked Petitioner whether Respondents would be harmed by reinstating the six terminated employees. Petitioner represented that there is evidence that Respondents add fifty employees per year and that there would be productive work available to the discriminatees if reinstated. Respondents indicated that reemploying these individuals would result in significant harm in that they would essentially be forced to recreate positions that are no longer there. However, he also stated that the demand for skilled miners is acute. The Court notes that Mr. Lusk testified at the administrative hearing that the "Dynamic operation was the most rapidly expanding operation east of the Mississippi. It went from approximately 700,000 tons to 1.4 million [per year]." (Docket 22-6 at 49.) Considering this evidence and all of the evidence presented at the hearing, the Court finds that any harm Respondents would suffer by reinstating the employment of the discriminatees is at least outweighed by the potential for irreparable harm to the individuals and the union, discussed above.

D. Public Interest

For the reasons discussed above, the public interest weighs in favor of granting Petitioner's relief, in part. The public has an interest in seeing the NLRA enforced. The NLRA was designed to eliminate what Congress considered to be the cause of certain obstructions to the free-flow of commerce "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of

their employment or other mutual aid or protection." 29 U.S.C. § 151 (Findings and declaration). When an employer engages in unfair labor practices by retaliating against employees who seek the association and protections of the union, the public policy of the United States is hindered. Petitioner repeated during the hearing, and the Court agrees, that a delay in relief could be tantamount to a denial of relief, regardless of the outcome of the administrative process. Employees will be unlikely to join a union if they see that the consequences for engaging in this protected activity could be an excessive delay in getting their jobs back.

That said, the Court must point out that Petitioner took eleven months to file its charge against Respondents. After careful consideration, the Court finds that this delay does not diminish the usefulness of relief at this stage. The Court does, however, agree with Respondents that certain relief can act as a substitution of "relief by the NLRB in the normal exercise of its adjudicative functions." (Resp. 9.) Specifically, the Court granting Petitioner's request for a court order requiring that Respondents bargain in good faith with the union during the pendency of the administrative process would be such a substitution.

For the reasons stated above, the Court **ORDERS** that Petitioner's Petition for Preliminary Injunction Under Section 10(j) of the National Labor Relations Act, as Amended [Docket 1] is **GRANTED** in part, as set forth below:

Respondents are **ORDERED** to (1) offer, on an interim basis, discharged employees Jeremy Blankenship, Nathan Brown, Christopher Champagne, Philip Coleman, Steven Paynter and Herrick S. Sheppard reinstatement to their former positions, or, if those positions are unavailable, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges enjoyed; (2) refrain from discharging employees because of their engagement in union

or other protected activities; (3) post copies of this Memorandum Opinion and Order at the Coal Mountain, West Virginia, mine site in all locations where notices to employees are customarily posted, and maintain these postings during the administrative process free from obstructions and defacements, and grant to agents of the NLRB reasonable access to these facilities in order to monitor compliance with the posting requirement; and (4) within thirty (30) days of the entry of this opinion and order, file with the Court, and serve a copy to Petitioner, a sworn affidavit from a responsible official of Respondents, setting forth with specificity the manner in which Respondents have complied with the Court's Order.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER: June 30, 2011

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA